61 F.3d 1505
 JANE L., on behalf of herself and all others similarly
situated; Utah Women's Clinic, P.C.; Planned Parenthood
Association of Utah; David Hansen, M.D.; Madhuri Shah,
M.D.; John Carey, M.D.; Dan Chichester, M.D.; Kirtly
Parker Jones, M.D.; Kathleen Kennedy, M.D.; Neil K.
Kochenour, M.D.; Rhonda Lehr, M.D.; Claire Leonard, M.D.;
Kenneth Ward, M.D.; Bonnie Jeanne Baty, M.D.; Susan
Elizabeth Lyons, L.C.S.W.; Janet Lynn Wolf, L.C.S.W.;
Leslie McDonald-White, L.C.S.W.; Reverend David Butler;
Reverend Barbara Hamilton-Holway; Reverend George H. Lower;
Reverend Lyle D. Sellards; Reverend Doctor Alan Condie
Tull; Reverend Marie Soward Green; Rabbi Frederick L.
Wenger; Jane J. Freedom, (Pseudo-Name); Julie Spouse,
(Pseudo-Name); American College of Obstetricians and
Gynecologists, Utah Sections; Penny Thompson; Wendy
Edwards, Plaintiffs-Appellants,
v.
Norman H. BANGERTER, as Governor of the State of Utah; Paul
Van Dam, Attorney General, as Attorney General of
Utah, Defendants-Appellees.
 No. 93-4145.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 2, 1995.
 
 Leon Friedman of Hofstra Law School, Hempstead, NY (A. Howard Lundgren, of Keller & Lundgren, L.C., Salt Lake City, UT; Jeffrey R. Oritt, of Cohne, Rappaport & Segal, P.C., Salt Lake City, UT; Kathryn D. Kendell, of American Civil Liberties Union of Utah, Salt Lake City, UT; Janet Benshoof, Rachael N. Pine, Lenora M. Lapidus, and Eve C. Gartner, of The Center for Reproductive Law & Policy, New York City; and Roger K. Evans, of Planned Parenthood Federation of America, Inc., New York City, with him on the briefs), for plaintiffs-appellants.
 Jerrold S. Jensen, Asst. Atty. Gen., Salt Lake City, UT (Jan C. Graham, Utah Atty. Gen. and James R. Soper, Asst. Atty. Gen.; Mary Anne Q. Wood, Anthony B. Quinn, and Kathryn O. Balmforth, Salt Lake City, UT; and Paul M. Durham of Durham, Evans & Jones, Salt Lake City, UT, with him on the brief), for defendants-appellees.
 Before SEYMOUR, Chief Judge, MOORE, Circuit Judge, and BROWN, Senior District Judge.*
 SEYMOUR, Chief Judge.
 
 
 1
 The instant case is the attorneys fees arm of the Jane L. v. Bangerter abortion litigation that has been moving through the federal courts since 1991. The district court awarded attorneys fees to plaintiffs, but in an amount dramatically less than that requested. The court also awarded attorneys fees to defendants. We reverse in part and remand for two primary reasons. First, we reversed many of the district court's substantive decisions, altering plaintiffs' overall success level. See Jane L. v. Bangerter, 61 F.3d 1493 (10th Cir.1995). Second, the district court abused its discretion in penalizing plaintiffs for raising alternative legal theories and in awarding attorneys fees and expenses to defendants.
 
 I.
 BACKGROUND
 
 2
 In April 1991, plaintiffs filed a complaint challenging the revised Utah Abortion Act, Utah Code Ann. Secs. 76-7-301 et seq., which they amended soon thereafter. Following a period of discovery, defendants filed a Motion to Dismiss and a Motion for Partial Summary Judgment. In Jane L. v. Bangerter, 794 F.Supp. 1537 (D.Utah 1992) (Jane L. II ), the district court granted several of defendants' motions.[1] In Jane L. v. Bangerter, 794 F.Supp. 1528 (D.Utah 1992) (Jane L. I ), the district court denied plaintiffs' motion to voluntarily dismiss without prejudice claims arising under the Utah Constitution and instead dismissed these claims with prejudice. The Supreme Court heard arguments in Planned Parenthood of Southeastern Pennsylvania v. Casey, --- U.S. ----, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), one month before the district court issued Jane L. II. The district court kept plaintiffs' remaining claims under advisement pending the Supreme Court's June 29, 1992 decision in Casey. The district court subsequently resolved these pending claims, holding that the pre-20 week abortion restrictions and the spousal notification provision were unconstitutional. Jane L. v. Bangerter, 809 F.Supp. 865 (D.Utah 1992) (Jane L. III ). The court upheld the choice of method provisions, the serious medical emergency exception, and the stringent limitations on the availability of post-20 week abortions. Id.
 
 
 3
 Plaintiffs appealed several of the holdings in Jane L. II and Jane L. III. We reversed in substantial part, holding that 1) the post-20 week abortion restrictions are not severable from the pre-20 week restrictions held violative of Casey; 2) the fetal experimentation provision is unconstitutionally vague; and 3) the choice of method provisions are unconstitutional. We affirmed the constitutionality of the serious medical emergency exception.
 
 
 4
 Following its decision in Jane L. III, the district court entertained plaintiffs' and defendants' motions for attorneys fees pursuant to 42 U.S.C. Sec. 1988. Jane L. v. Bangerter, 828 F.Supp. 1544 (D.Utah 1993) (Jane L. IV ). The court calculated attorneys fees in three steps. First, it arrived at the lodestar by multiplying a reasonable number of hours by a reasonable hourly rate. It then reduced by thirty-five percent the number of hours requested by plaintiffs' attorneys because of imprecise, inflated, and generalized recording methods. In deciding the reasonable rate per hour, the district court applied commensurate Salt Lake City rather than New York City rates to those lawyers from New York. Second, the court further reduced the lodestar by seventy-five percent to reflect plaintiffs' "limited success." Third, the district court awarded defendants attorneys fees because it held that plaintiffs filed frivolous claims. In the end, the district court awarded plaintiffs $71,663.47 and defendants $68,952.80 in attorneys fees. The court ordered plaintiffs to pay $53,110.33 of defendants' attorneys fees and instructed plaintiffs' counsel to pay the remaining $15,847.47. The court denied plaintiffs' and defendants' requests for costs and partially granted their requests for expenses.
 
 
 5
 Plaintiffs appeal the district court's decision, contesting each step in the calculation of their fee award. Plaintiffs also appeal the district court's denial of their request for costs and its partial denial of their request for expenses. "[A]n attorney's fee award by the district court will be upset on appeal only if it represents an abuse of discretion." Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1201 (10th Cir.1986). We similarly review the district court's determination of costs and expenses for an abuse of discretion. See Riggs v. Scrivner, Inc., 927 F.2d 1146, 1149 (10th Cir.), cert. denied, 502 U.S. 867, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991). We will reverse subsidiary factual findings only if they are clearly erroneous. Mares, 801 F.2d at 1201. Because we greatly altered plaintiffs' success level in our decision on the merits, we necessarily must reverse the district court's determination of attorneys fees, expenses, and costs to the extent the court based those awards on plaintiffs' limited success below. In addition, we will address those issues raised by plaintiffs that will likely reoccur in the redetermination of attorneys fees and costs on remand.
 
 II.
 LODESTAR CALCULATION
 
 6
 Title 42 U.S.C. Sec. 1988(b) provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." A plaintiff who "succeed[ed] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit" is a "prevailing party." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir.1978)). To determine a reasonable attorneys fee, the district court must arrive at a "lodestar" figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate. Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984); Hensley, 461 U.S. at 433, 103 S.Ct. at 1939.
 
 
 7
 At the district court level, plaintiffs succeeded in invalidating the pre-20 week abortion restrictions and the spousal notification provision. On appeal, plaintiffs further succeeded in invalidating the post-20 week abortion restrictions, the fetal experimentation provision, and the choice of method provisions. Plaintiffs argue that the district court abused its discretion in calculating the lodestar by excessively reducing the number of compensable hours and by erroneously applying Salt Lake City rather than New York City hourly rates.
 
 
 8
 The district court reduced the number of compensable hours by 35%, concluding that "plaintiffs' requested hours far exceed the hours that reasonably would be required by reasonably competent attorneys in handling this litigation." Jane L. IV, 828 F.Supp. at 1551. The district court found that "with few exceptions, plaintiffs' counsel as a whole have not adequately excluded requests for 'excessive, redundant, or otherwise unnecessary' hours." Id. at 1548 (applying standard enunciated in Hensley, 461 U.S. at 434, 103 S.Ct. at 1939-40). The court further found that "[p]laintiffs' time records include unspecified or inadequately specified 'review' time, excessive travel time, unnecessary and duplicative time spent in conference calls, meetings, and hearings, noncompensable public relations time, noncompensable time expended after the judgment was rendered, and noncompensable clerical or 'overhead' time." Id. at 1549. Plaintiffs contend that the district court's reduction was excessive, but only appeal its reduction for time spent on review, travel, and the attorneys fees application, as well as on overlapping and duplicative time entries.
 
 
 9
 We review the district court's determination of reasonable hours for an abuse of discretion. See Mares, 801 F.2d at 1201. Plaintiffs' burden in an application for attorneys fees is to "prove and establish the reasonableness of each dollar, each hour, above zero." Id. at 1210. To meet that burden, we require that lawyers keep meticulous time records that "reveal ... all hours for which compensation is requested and how those hours were allotted to specific tasks." Ramos v. Lamm, 713 F.2d 546, 553 (10th Cir.1983). The prevailing party must make a "good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434, 103 S.Ct. at 1939-40.
 
 
 10
 After a review of the record, we conclude that the district court did not abuse its discretion by reducing the number of compensable hours. Plaintiffs' rather sloppy and imprecise time records failed to document adequately how plaintiffs' attorneys utilized large blocks of time. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." Id. at 433, 103 S.Ct. at 1939. We hold that the district court's 35% reduction of the hours requested fell within its realm of discretion.
 
 
 11
 Plaintiffs' New York City attorneys requested hourly rates commensurate with those received by private attorneys in New York City. The district court instead applied the prevailing Salt Lake City rates that coincided with the experience and expertise of each New York City attorney. Jane L. IV, 828 F.Supp. at 1551-52. Plaintiffs assert that their New York City attorneys should receive the higher, New York City hourly rates.
 
 
 12
 The setting of a reasonable hourly rate is within the district court's discretion. Carter v. Sedgwick County, 36 F.3d 952, 956 (10th Cir.1994). Hourly rates must reflect the "prevailing market rates in the relevant community." Blum v. Stenson, 465 U.S. at 895, 104 S.Ct. at 1547. Unless the subject of the litigation is "so unusual or requires such special skills" that only an out-of-state lawyer possesses, "the fee rates of the local area should be applied even when the lawyers seeking fees are from another area." Ramos v. Lamm, 713 F.2d at 555. We are persuaded by our review of the record that the district court did not abuse its discretion in using Salt Lake City rates as the basis for identifying reasonable hourly rates.
 
 III.
 REDUCTION OF LODESTAR FOR LIMITED SUCCESS
 
 13
 The district court reduced the lodestar by seventy-five percent to reflect plaintiffs' "limited success." It articulated the following rationale: 1) because plaintiffs were only successful on a small fraction of their claims, their compensation should be prorated to reflect their success rate; 2) plaintiffs' alternative theories for invalidating the pre-20 week abortion ban were unrelated to the successful due process claim and therefore should be considered unsuccessful and distinct claims for purposes of adjusting the lodestar; and 3) plaintiffs' unsuccessful statutory challenges were unrelated to its successful challenges and therefore should be factored into "limited success." Plaintiffs challenge each of these theories.
 
 
 14
 A. Measuring "Limited Success"
 
 
 15
 The district court found that plaintiffs prevailed on two out of eight claims.[2] See Jane L. IV, 828 F.Supp. at 1553. The court then reduced the lodestar by seventy-five percent without making any qualitative assessments regarding relative importance of one claim versus another. Given the coincidental correlation between the ratio of successful to unsuccessful claims and the percentage by which the district court reduced the lodestar, it appears that the court did not assess the relative importance of plaintiffs' successes and failures. Of course on remand the district court will have to reassess the degree of success in light of our merits determination. In view of our concern that the court may have mechanically weighed each successful and unsuccessful claim equally, we set out the governing standards.
 
 
 16
 Hensley contemplates adjustments to the lodestar to reflect plaintiffs' overall success level.
 
 
 17
 Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.... In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.... If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.
 
 
 18
 Hensley, 461 U.S. at 435-36, 103 S.Ct. at 1940-41. In making such adjustments, however, Hensley requires that lower courts make qualitative comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success. "When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained." Id. at 437, 103 S.Ct. at 1941. In other words, the district court must make a qualitative assessment to determine what less-than-perfect results are "excellent," justifying full recovery, or to what extent plaintiffs' "limited success" should effect a reduction in the lodestar. "There is no precise rule or formula" for making such determinations. Id. at 436, 103 S.Ct. at 1941. In rationalizing its approach, the Court stated,
 
 
 19
 Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
 
 
 20
 Id. at 435, 103 S.Ct. at 1940.
 
 
 21
 The district court reduced the lodestar by seventy-five percent without demonstrating that it qualitatively considered the relationship between the amount of the fee award and the results. Rather, it merely listed successful and unsuccessful claims. On remand, the court should demonstrate on the record its assessment of the losses in light of the time necessarily devoted to the litigation as a whole and the general overall success of plaintiffs.
 
 B. Related Claims
 
 22
 The district court held that Utah's pre-20 week ban on abortions contravened Casey and therefore violated a woman's right to privacy. Jane L. III, 809 F.Supp. at 870. This holding achieved plaintiffs' primary purpose in bringing this litigation--preserving a woman's right to a pre-viability abortion pursuant to the Fourteenth Amendment Due Process Clause. Plaintiffs set forth several alternative arguments to achieve this end, arguing that the Equal Protection Clause, the Thirteenth Amendment, and the First Amendment all support a woman's underlying right to a pre-viability abortion. In the attorneys fees phase, the district court held that the successful due process claim was unrelated to the alternative legal theories. Jane L. IV, 828 F.Supp. at 1553.
 
 
 23
 If claims are related, failure on some claims should not preclude full recovery if plaintiff achieves success on a significant, interrelated claim. "Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." Hensley, 461 U.S. at 440, 103 S.Ct. at 1943; see also Spulak v. K Mart Corp., 894 F.2d 1150, 1160 (10th Cir.1990).
 
 
 24
 A claim is related to another claim if it is based on "a common core of facts." Hensley, 461 U.S. at 435, 103 S.Ct. at 1940. We have refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a "common core of facts." In Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir.1993), for example, we held that the trial court abused its discretion in reducing attorneys fees for a plaintiff who prevailed under some provisions of the Equal Pay Act but failed on her Title VII and state law claims.
 
 
 25
 The trial court stated that 'she succeeded on the significant issue of rectifying her past pay disparity.' As mentioned, there was one bundle of proof presented on the three issues. There was no way to separate the work on the core issue. Her attorneys were entitled to be fully compensated pursuant to Hensley v. Eckerhart, ... rather than having reductions made for the Title VII matter and the state law claims.
 
 
 26
 Id. at 412-13; see also Durant v. Independent Sch. Dist. No. 16, 990 F.2d 560, 566 (10th Cir.1993) ("Because Ms. Durant's claims arose out of a common core of facts and involved related legal theories, the district court may ... conclude her prevailing party status on the First Amendment claim subsumes her failure to succeed ultimately on the due process claim.").
 
 
 27
 Claims are also related to each other if based on "related legal theories." Hensley, 461 U.S. at 435, 103 S.Ct. at 1940. "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." Id.
 
 
 28
 The equal protection, First Amendment, and involuntary servitude claims were alternative theories designed to challenge the pre-20 week abortion ban. The theories were based on a common core of facts--a highly restrictive abortion statute designed to challenge and topple the Roe framework. The Supreme Court clearly held in Hensley that plaintiffs can argue alternative legal theories without being penalized at the attorneys fees stage if the court only adopts one of the theories. Contrary to the district court, we hold that plaintiffs' successful due process claim was related to their unsuccessful alternative claims made in support of the argument against the same statutory provision. We therefore hold that success on the due process claim precludes reduction of the lodestar on the basis of those alternative theories.
 
 
 29
 The district court also found that "challenges to the serious medical emergency statute, the spousal notification statute, and the statute banning fetal experimentation involve completely different sets of facts," making them "several separate lawsuits brought in one action." Jane L. IV, 828 F.Supp. at 1553. Plaintiffs appeal this holding, arguing that the statutory challenges are based on a "common core of facts" and therefore success on one major claim, the pre-20 week abortion restrictions for example, precludes using the others for a limited success reduction. We disagree with plaintiffs' assertion on this point. As our opinion on the merits in Jane L. v. Bangerter, 61 F.3d 1493 (10th Cir.1995), demonstrates, each substantive claim raises a host of unrelated issues. Our determination that the fetal experimentation provision was unconstitutionally vague did not aid in our analysis of the choice of method provisions. Neither of these substantive claims helped us decide whether the post-20 week abortion restrictions were severable from the pre-20 week restrictions. The fact that the Utah legislature passed all of these provisions under the umbrella of the "Utah Abortion Act" does not, in and of itself, create a common core of facts. We hold the district court did not err in concluding that the unsuccessful statutory challenges were unrelated for purposes of determining the limited success reduction. Of course, since plaintiffs have now prevailed on most of their statutory challenges, the district court will have to reassess the wins and losses.
 
 IV.
 DEFENDANTS' ATTORNEYS FEES
 
 30
 The district court awarded defendants attorneys fees against plaintiffs upon holding that the involuntary servitude, Establishment Clause, and equal protection claims were frivolous. Jane L. IV, 828 F.Supp. at 1554-56.[3] Plaintiffs vehemently dispute this conclusion.
 
 
 31
 "A prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." See Hensley, 461 U.S. at 429 n. 2, 103 S.Ct. at 1937 n. 2 (citing H.R.Rep. No. 1558, 94th Cong. 7 (1976); Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)); see also id. at 435 n. 10, 103 S.Ct. at 1940 n. 10. In Christiansburg, incorporated into section 1988 jurisprudence through footnote 2 of Hensley, the Supreme Court examined when prevailing defendants may recover attorneys fees in Title VII actions. It concluded that "a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith" enabled defendants to recover attorneys fees. Christiansburg, 434 U.S. at 421, 98 S.Ct. at 700. In setting forth this standard, the Court underscored that district courts must resist
 
 
 32
 the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.
 
 
 33
 Id. at 421-22, 98 S.Ct. at 700. Claims that the district court dismisses for failure to state a claim do not automatically meet the standard set forth in Christiansburg and Hensley for an award of fees to the defendants. See Hughes v. Rowe, 449 U.S. 5, 15, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980). Those claims dismissed on 12(b)(6) motions that receive "careful consideration," especially as evidenced by lengthy, detailed, and reasoned orders or opinions, are not "groundless" or "without foundation." Id. at 15-16, 101 S.Ct. at 178-79.
 
 
 34
 At the time this lawsuit was filed, at least one Supreme Court Justice favored overturning Roe v. Wade, see Webster v. Reproductive Health Servs., 492 U.S. 490, 532-37, 109 S.Ct. 3040, 3064-66, 106 L.Ed.2d 410 (1989) (Scalia, J., concurring), and several Justices had questioned the strict scrutiny review mandated by Roe, see id. at 513-22, 109 S.Ct. at 3054-58 (Rehnquist, C.J., joined by White and Kennedy, JJ.); id. at 530, 109 S.Ct. at 3063 (O'Connor, J., concurring). The Utah abortion law was designed to test Roe in this time of great uncertainty, attempting to force a sharp turn in abortion jurisprudence that would permit a state to ban abortions pre-viability. Plaintiffs framed the present lawsuit against this backdrop of expressed hostility toward Roe. Just as defendants may have hoped to chart a new course for abortion jurisprudence, plaintiffs hoped to preserve a woman's right to an abortion. Plaintiffs therefore reached for alternative theories that the Supreme Court had not squarely rejected.
 
 
 35
 We initially note that the district court in Jane L. II gave the involuntary servitude,[4] Establishment Clause,[5] and equal protection[6] arguments more than cursory review. While it granted defendants' motion for summary judgment on these claims, it did not at that stage label any of the arguments frivolous.[7] If these alternative theories were truly frivolous, the district court would have had no need to engage in prolonged and fact-specific inquiries. See Hughes v. Rowe, 449 U.S. at 15-16, 101 S.Ct. at 178-79.
 
 
 36
 Defendants explicitly note that the Supreme Court has chosen not to address the equal protection and involuntary servitude arguments on various occasions, but at the same time implicitly concede that the Court has not rejected these arguments. See Aplee.Br., Addendum D, E. Nor do defendants cite any cases in which the Supreme Court has squarely addressed and rejected the Establishment Clause argument in the abortion context.[8] If the fact that the Supreme Court has not accepted a particular argument makes it frivolous, then Utah's legislative attempt to undermine a woman's right to a pre-viability abortion, an approach that was clearly rejected in Roe v. Wade, should also be deemed frivolous. A legal argument is not frivolous merely because the Supreme Court has failed to affirmatively address and accept it. This is particularly so where the contentions find support among legal treatises or Supreme Court Justices.
 
 
 37
 Plaintiffs argued below that Utah's ban on abortions throughout pregnancy constituted involuntary servitude in violation of the Thirteenth Amendment. The district court rejected this argument, holding as a matter of law that the Utah abortion statute does not violate the Thirteenth Amendment. Jane L. II, 794 F.Supp. at 1548-49. In Jane L. IV, the district court labeled this argument frivolous. 828 F.Supp. at 1554-55.
 
 
 38
 Laurence Tribe, a prominent constitutional law scholar, has written, "A woman forced by law to submit to the pain and anxiety of carrying, delivering, and nurturing a child she does not wish to have is entitled to believe that more than a play on words links her forced labor with the concept of involuntary servitude." Laurence H. Tribe, American Constitutional Law, Sec. 15-10, at 1354 (2d ed. 1988). Professor Tribe further notes that judicial recognition of the similarities between the historical plight of women and blacks underscores the Thirteenth Amendment's relevance. Id. at 1534 n. 113 (citing Frontiero v. Richardson, 411 U.S. 677, 685, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973) (Brennan, J., joined by Douglas, White, and Marshall, JJ.)).[9]
 
 
 39
 In fact, in a challenge to Utah's previous abortion statute, one judge drew the analogy between restrictive state regulation of abortion and involuntary servitude. In Roe v. Rampton, 394 F.Supp. 677 (D.Utah 1975), aff'd, 535 F.2d 1219 (10th Cir.1976), a three-judge panel examined the constitutionality of the spousal/parental notification prong of Utah's abortion statute, ultimately holding that it could not grant a preliminary injunction and would abstain until the state courts addressed the issue. In a dissent, Judge Ritter, then Chief Judge of the District of Utah, wrote, "The old abortion law [which severely limited a woman's ability to obtain an abortion] was a drastic constitutional invasion of the rights of human beings, namely[ ] women, who were compelled to go through with a pregnancy, which is a form of involuntary servitude." Id. at 689 (Ritter, C.J., dissenting on other grounds) (emphasis added). Without expressing a view on the merits of the involuntary servitude argument, we hold that it is not frivolous.
 
 
 40
 Plaintiffs also contended that the Utah Abortion Act violates the Establishment Clause, which provides: "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This clause has been interpreted by the Supreme Court to mean that "government may not promote or affiliate itself with any religious doctrine or organization" and "may not discriminate among persons on the basis of their religious beliefs." County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 590, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989). Under Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), a statute is struck down on Establishment Clause grounds if it fails any one of the following three prongs: (1) the statute must have a clearly secular purpose; (2) the principal or primary effect of the statute must not be to advance or inhibit religion; and (3) the statute must not foster excessive entanglement with religion. Id. at 612-13, 91 S.Ct. at 2111.
 
 
 41
 In the preamble of the Utah abortion statute, the Utah legislature noted: "[U]nborn children have inherent and inalienable rights that are entitled to protection by the state...." Utah Code Ann. Sec. 76-7-301.1(1). Plaintiffs argued below that this preamble was unconstitutional because it embodies a religious viewpoint concerning the rights of unborn children. Furthermore, section 302 banned all abortions except in narrow circumstances. Utah Code Ann. Sec. 76-7-302. These statutory exceptions directly track the official position of the Church of Jesus Christ of Latter Day Saints (LDS Church) regarding when an abortion is permissible, and plaintiffs claimed that this incorporation of the LDS position violates the Establishment Clause. The district court rejected plaintiffs' arguments, granting defendants' motion for summary judgment on this claim. Jane L. II, 794 F.Supp. at 1542-46. At the attorneys fees stage, the district court labeled the Establishment Clause claim frivolous and used it as a basis to grant defendants attorneys fees. Jane L. IV, 828 F.Supp. at 1555-56.
 
 
 42
 An active Supreme Court Justice, Justice Stevens, recognizes that statutory tracking of a particular religion's position on abortion can amount to a violation of the Establishment Clause. In Webster, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410, the Court held that the preamble of the statute there, which set forth "findings" that the " 'life of each human being begins at conception' " and that " '[u]nborn children have protectable interests in life, health, and well-being,' " did not by its terms regulate abortion but rather constituted a value judgment, and, therefore, the Court had no need to pass on its constitutionality. Id. at 504-07, 109 S.Ct. at 3049-50 (quoting Mo.Rev.Stat. Secs. 1.205.1(1)(2) (1986)). Justice Stevens, in a dissent, addressed the constitutional merits of this claim, stating that the preamble violated the Establishment Clause:
 
 
 43
 I am persuaded that the absence of any secular purpose for the legislative declarations that life begins at conception and that conception occurs at fertilization makes the relevant portion of the preamble invalid under the Establishment Clause of the First Amendment to the Federal Constitution. This conclusion does not, and could not, rest on the fact that the statement happens to coincide with the tenets of certain religions or on the fact that the legislators who voted to enact it may have been motivated by religious considerations. Rather, it rests on the fact that the preamble, an unequivocal endorsement of a religious tenet of some but by no means all Christian faiths, serves no identifiable secular purpose. That fact alone compels a conclusion that the statute violates the Establishment Clause.
 
 
 44
 Id. at 566-67, 109 S.Ct. at 3082-83 (citations and footnotes omitted). While the Utah statute is admittedly different from the statute at issue in Webster in that it does not enunciate in the preamble that life begins at conception, the more general point that Justice Stevens emphasizes is pertinent here: explicit statutory incorporation of a particular religion's belief may violate the Establishment Clause.[10] We are persuaded that the district court erred in holding this argument frivolous.
 
 
 45
 Plaintiffs also argued below that because "only women's reproductive choices and rights to bodily integrity are being denied," Utah's abortion act violates the Equal Protection Clause of the Fourteenth Amendment. Jane L. II, 794 F.Supp. at 1549. The district court granted defendant's motion for summary judgment on this claim, and thereafter labeled it frivolous when addressing attorneys fees.
 
 
 46
 Justice Ginsburg advocates an equal protection approach to abortion jurisprudence. In a 1992 lecture, then-Judge Ginsburg criticized Roe and suggested that the Court missed an opportunity to link Roe to its developing gender-based equal protection jurisprudence. Ruth Bader Ginsburg, "Speaking in a Judicial Voice," 67 N.Y.U.L.Rev. 1185, 1199-1208 (1992). Suggesting that Casey may have created space for a shift in abortion jurisprudence toward the equal protection rubric, she cited, as plaintiffs do, language from Casey: "[Justices O'Connor, Kennedy, and Souter] acknowledged the intimate connection between a woman's 'ability to control [her] reproductive li[fe]' and her 'ability ... to participate equally in the economic and social life of the Nation.' " Id. at 1199 (quoting Casey, --- U.S. at ----, 112 S.Ct. at 2809).
 
 
 47
 In addition, Laurence Tribe believes that restrictions on abortion are really about uneven power relationships between men and women.
 
 
 48
 The Court's apparent intuition that abortion rights are somehow grounded in relational concerns is nonetheless correct--but the relevant relationships are not those between doctors and patients, but those between women and men, and between pregnant women and the fetuses they carry. The failure of both plaintiffs and courts to frame the abortion controversy in terms of sexual equality has profoundly affected the law in this area.
 
 
 49
 Tribe, American Constitutional Law, at 1353. These recognized legal authorities undermine the district court's conclusion that plaintiffs' equal protection arguments were frivolous.[11]
 
 
 50
 In sum, the Utah legislature passed a law patently violative of prevailing abortion jurisprudence with the expressed intent of uprooting that jurisprudence. To defend against this legal attack, plaintiffs searched for alternative legal theories to serve as a back-up in case the Supreme Court rejected the due process/right to privacy underpinnings of a woman's right to an abortion. In so doing, plaintiffs relied on theories that had not been squarely rejected by the Supreme Court and that were grounded in legal treatises or advocated by an active Supreme Court Justice. Without expressing a view regarding the merit of these legal theories, we conclude the district court erred in holding the asserted theories to be frivolous. We reverse the district court's award of attorneys fees to defendants.
 
 V.
 COSTS
 
 51
 Rule 54(d) of the Federal Rules of Civil Procedure provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Under this rule, costs include clerk and marshal fees, court reporters' fees, printing and witness fees, copying fees, and certain docket fees. 28 U.S.C. Sec. 1920. We review the district court's decision regarding the award of costs under Rule 54(d) for an abuse of discretion. Howell Petroleum Corp. v. Samson Resources Co., 903 F.2d 778, 783 (10th Cir.1990).
 
 
 52
 The district court first identified which of plaintiffs' itemized requests were includable as "costs" under section 1920, concluding that plaintiffs were entitled to $13,009.19 in such costs. Plaintiffs do not appeal that conclusion.
 
 
 53
 The district court then decided that both plaintiffs and defendants "were successful on some claims," making them both "prevailing parties." Jane L. IV, 828 F.Supp. at 1558. Because plaintiffs and defendants requested costs "in approximately equal amounts," the court decided to order parties to bear their own costs. Id. Plaintiffs appeal this holding. In light of our decision in Jane L. v. Bangerter, 61 F.3d 1493 (10th Cir.1995), we have significantly altered the landscape regarding the claims on which plaintiffs and defendants respectively prevailed. Consequently, we reverse the district court's decision and remand for further consideration of this matter.
 
 VI.
 EXPENSES
 
 54
 While only those items listed under section 1920 may be awarded as costs, other out-of-pocket expenses incurred during litigation may be awarded as attorneys fees under section 1988 if (1) the expenses are not absorbed as part of law firm overhead but are normally billed to a private client, and (2) the expenses are reasonable. See Bee v. Greaves, 910 F.2d 686, 690 (10th Cir.1990). The district court awarded plaintiffs and defendants expenses under section 1988. However, the court denied plaintiffs' request for travel expenses, thereby dramatically reducing the amount awarded. Plaintiffs argue on appeal that they should have been reimbursed for these travel expenses. We are not persuaded that the district court abused its discretion in denying this request.
 
 
 55
 Plaintiffs also contend that defendants were not entitled to expenses under section 1988, just as they were not entitled to attorneys fees. Our holding in part IV supra that plaintiffs' claims were not frivolous undermines the district court's award of expenses to defendants, and we reverse on this issue as well.
 
 VII.
 CONCLUSION
 
 56
 In Jane L. v. Bangerter, 61 F.3d 1493 (10th Cir.1995), we altered plaintiffs overall success level. Consequently, we must REVERSE those sections of the district court's award of attorneys fees and costs that rely on plaintiffs' success level prior to the substantive appeal and REMAND so that the district court can factor plaintiffs' heightened success into its determination. We also conclude that the district court abused its discretion in setting the fee award by reducing the lodestar on the basis of alternative legal theories and by awarding defendants attorneys fees and expenses. We REVERSE the district court's award of attorneys fees, expenses, and costs, and REMAND for reconsideration in light of the analysis set forth herein.
 
 
 
 *
 Honorable Wesley E. Brown, Senior United States District Judge, District of Kansas, sitting by designation
 
 
 [1]
 In Jane L. II, the district court held in favor of defendants on the following claims: vagueness, equal protection, Establishment Clause, Free Exercise Clause, involuntary servitude, freedom of speech, and fetal experimentation (vagueness and privacy)
 
 
 [2]
 Plaintiffs succeeded in invalidating the pre-20 week restrictions on abortions (Utah Code Ann. Sec. 76-7-302(2)) and the spousal notification statute (Utah Code Ann. Sec. 76-7-304(2)). They were unsuccessful below on the following claims: 1) the post-20 week abortion restrictions in Utah Code Ann. Sec. 76-7-302(3); 2) the choice of method provisions in Utah Code Ann. Secs. 76-7-307 and 308; 3) the serious medical emergency provision in Utah Code Ann. Sec. 76-7-315; 4) the criminalization provision in Utah Code Ann. Sec. 76-7-314; 5) the alternative legal theories advanced to maintain the underlying right to an abortion; and 6) the state constitutional claims
 
 
 [3]
 The district court also awarded defendants attorneys fees in the amount of $15,847.47 against plaintiffs' counsel for filing state constitutional claims that the court held to be frivolous. Plaintiffs vigorously dispute this holding as well. However, we lack jurisdiction to review this issue under Torres v. Oakland Scavenger Co., 487 U.S. 312, 314, 108 S.Ct. 2405, 2407, 101 L.Ed.2d 285 (1988), and Riggs v. Scrivner, Inc., 927 F.2d 1146, 1149 (10th Cir.1991), because the notice of appeal failed to name plaintiffs' counsel as parties to the appeal. We held in Riggs that where sanctions have been imposed against counsel rather than a party, counsel are the proper parties to an appeal contesting those sanctions. 927 F.2d at 1149
 
 
 [4]
 The district court granted defendants' motion for summary judgment on the involuntary servitude claim only after a page-long discussion of the parameters of the Thirteenth Amendment. See Jane L. II, 794 F.Supp. at 1548-49
 
 
 [5]
 The district court granted defendants' motion for summary judgment on the Establishments Clause issue only after a lengthy application of the facts of this case to the three-pronged test set forth in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). See Jane L. II, 794 F.Supp. at 1542-46
 
 
 [6]
 The district court granted defendants' motion on the equal protection claim, but only after a more-than-cursory review of Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), and Michael M. v. Sonoma County Superior Court, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981). See Jane L. II, 794 F.Supp. at 1549
 
 
 [7]
 The district court stated: "Plaintiffs argue that prohibiting elective abortions forces women into 'slavery' or 'involuntary servitude' by carrying a child to term. It strains credulity to equate the carrying of a child to term with 'compulsory labor' and the argument borders on the frivolous." Jane L. II, 794 F.Supp. at 1549 (emphasis added). The district court did not conclude that the argument was frivolous, however, and in fact gave it more than minimal consideration
 
 
 [8]
 See discussion of Establishment Clause argument infra at 1516 n. 10
 
 
 [9]
 See also Andrew Koppelman, "Forced Labor: A Thirteenth Amendment Defense of Abortion," 84 Nw.U.L.Rev. 480 (1990); Donald H. Regan, "Rewriting Roe v. Wade," 77 Mich.L.Rev. 1566 (1979)
 
 
 [10]
 Defendants argue that the Supreme Court's opinion in Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), forecloses plaintiffs' Establishment Clause argument. There the Court entertained an Establishment Clause challenge to the Hyde Amendment, the amendment to the Medicaid bill that prohibited most public funding of abortions, and held:
 [I]t does not follow that a statute violates the Establishment Clause because it 'happens to coincide or harmonize with the tenets of some or all religions.' That the Judaeo-Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny.... [W]e are convinced that the fact that the funding restrictions in the Hyde Amendment may coincide with the religious tenets of the Roman Catholic Church does not, without more, contravene the Establishment Clause.
 Id. at 319-20, 100 S.Ct. at 2689 (emphasis added). This holding does not necessarily preclude an Establishment Clause argument under different circumstances. If, for example, a religion only opposed stealing from a particular group and the state outlawed stealing only from that group, it might be a closer case under McRae and would require inquiry into the legitimacy of government interests. Because the Utah abortion law tracked almost verbatim the LDS Church's official position on abortion, a case-by-case, fact-specific inquiry would arguably be in order to determine whether the law does more than merely coincide with general "religious tenets" of the church.
 
 
 [11]
 Defendants argue that cases such as Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974) (holding that California state disability insurance, which denied disability benefits for normal pregnancy and childbirth, did not violate Equal Protection Clause), and Bray v. Alexandria Women's Health Clinic, --- U.S. ----, ----, 113 S.Ct. 753, 760, 122 L.Ed.2d 34 (1993) (holding that group's opposition to abortion is not a surrogate for a sex-based invidiously discriminatory animus in a 42 U.S.C. Sec. 1985(3) challenge to Operation Rescue's anti-abortion activities), foreclose an equal protection argument here. These cases are distinguishable from the instant case and do not preclude the future development of an abortion jurisprudence rooted in the Equal Protection Clause